First case of the day, Impax Laboratories v. FTC, 19-60394, Mr. Lefkowitz. Thank you, Your Honor, good morning, and may it please the Court, I appreciate the privilege of being able to argue this morning. This case involves a unique settlement where the reverse payment actually made consumers better off because it was the only way to ensure a competitive market for Opana ER from 2013 all the way until 2023. Because of this settlement, Impax is the only generic on that market today, and it therefore fits squarely within the type of reverse payment case that the Supreme Court and activists acknowledge do not violate the antitrust law. To avoid acknowledging that the settlement benefited consumers, the FTC rewrote the rule of reason and in doing so committed multiple errors. I'd like to just briefly highlight for you the three critical areas of error. First, the FTC concedes that where a restraint is reasonably necessary to achieve a pro-competitive end. Then under NCAA and under the Fifth Circuit case law, principally Realty Multilist, those pro-competitive benefits have to be considered at step two. And the payments in this case, the endo credit and the no AG, were reasonably necessary to achieve the pro-competitive benefits. On two separate occasions, Impax proposed settlements without payments. They proposed settlements with earlier dates and rejected. They were rejected by endo because endo's entire strategy was to remove its product and any generic competitor from the market before there could be competition. That's why it's an unusual case under action. Mr. Lefkowitz, so I have a question about that. Footnote 43 of the commission decision cast doubt on the trial testimony of your lead negotiator saying that in pre-trial testimony, he said he could not recall, first of all, that endo ever insisted on only a 2013 entry date and he couldn't recall that your client ever asked for, say, a 2012 entry date. So, your honor, the record actually reflects that there was a request for an entry date in 2010, in 2011, and in January of 2012. In the term sheets, and this is in the record, the FTC doesn't actually object to that. They do have that footnote where they say that, but that's in tension with the actual record where they acknowledge that there was a January of 2012 date that was proposed. The fact is- But if there's tension in the testimony, I mean, it sounds like your negotiator testified, at least in the commission's view, differently at trial than in his pre-trial testimony. Why isn't that just then a credibility determination, especially on this issue of whether endo insisted on only a 2013 entry date? Why isn't that a sort of a credibility finding that we have on substantial evidence review we have to defer to? Your honor, I think if the FTC were applying the proper test here and made a determination that there would have been an earlier entry, we would be in a different situation. All they say here is that, theoretically, there could have been an earlier entry, and the record does not reflect that, certainly, and I'm not suggesting that you defer to the ALJ's findings. They don't ask the right legal question. Well, on that, that raises another- something else I wanted to ask about. And I agree with you. There sort of seems to be a difference in what the legal question is on what was necessary or on the final inquiry, what's the least- was there a less restrictive alternative. You seem to view it as, would the parties have actually wanted to do a deal that had an earlier entry date? Could they- would they have agreed to that? Was it desirable to the parties? The FTC sees it more as, was that a viable potential existing alternative that just was out there? What's your best authority for your view that it has to be, you know, would the parties have actually agreed to or desired to enter into this less restrictive alternative? Well, the- the- to carry their burden on the less restrictive alternative, they have to show- this is under the Brown case and under the City of Tuolumne- they have to show by a preponderance of the evidence that the alternative is viable. And what they say, and this is, I think, perhaps the most critical error in the case, they say at the third step of rule of reason, they say, well, even if all of these pro-competitive benefits were there, even if we have to acknowledge that all of these other patents for which impacts got a license to under the settlement agreement, which it could not have conceivably done even if it had won the lawsuit, if these were later patents that were being issued, they say, well, we know that companies can always settle without reverse payments. And therefore, in this situation, since ENDO was willing to settle without making a payment, surely impacts would have taken a settlement without a payment. They don't actually show by a preponderance of the evidence that the alternative is viable because they don't even apply the right test. They flip the burden and they shift the burden to us to show that an earlier settlement with ENDO is impossible. That's just not the right legal test here. So I think what I'd like to show- And so your authority was, you cited Brown and city of, I'm sorry, what was the- City of Tuolumne. Correct. Thank you. And of course, Amex, the Supreme Court's most recent statement on rule of reason makes clear that at step three, the plaintiff has the burden to show that the benefits could reasonably be achieved through a less anti-competitive means. That's not just the question of what is theoretically possible here. Now there's also this question of the burden shifting with respect to the pro-competitive benefits. Here, this was a settlement where not only did the parties, when they got the entry date of January of 13, open up the market for the next eight months before the patent ends, because that's not particularly exceptional. Every patent settlement has a date that is both a little early and a little late, depending on whose perspective you're looking at. But as part of that negotiation, part of the consideration was a license to all of the other patents that ENDO had already started applying for, which it then successfully kept everybody else out of the market. So if you look at the but-for world, if IMPACTS had continued litigating and won the patent case, the ALJ says unlikely to have gotten in before 2013 anyway, because of the time it would have taken for the appeal to run. But even if you say theoretically they could have gotten in a little earlier, a couple of months earlier, they would have then been kicked off the market after only eight months. In September of 13, when that first patent that was in suit expired, as part of the settlement, they got a whole host of patents, which ENDO successfully used to keep other generics out of the market, and ENDO is still on the market seven years later with three more years of patent certainty. Those are the pro-competitive benefits, and what IMPACT, what the FTC did by shifting the burden of proof critically at step three here to force us to prove that an earlier settlement was impossible, they avoided doing the one thing that the rule of reason ultimately requires, which is weighing the pro-competitive benefits versus any anti-competitive effects. They simply said, oh, we don't have to reach that. I have one more question on step three. It sounds like your argument for why a less restrictive alternative was not available was really that ENDO was not willing to allow entry before 2013. And why was that? Well, because they were trying to do this product top, where people would no longer want their product and do the reformulated drug, and then they'd have another monopoly on that. In some courts, the Second Circuit has said that product topping can be anti-competitive. I mean, it's a little troubling to say, well, this is justified because they want to make a better deal so that they could engage in another arguably anti-competitive act. Do you see the concern? I mean, it just seems a little troubling. I absolutely do, Your Honor. And look, the FTC could have brought some type of claim and may in fact have brought a claim against ENDO for its product topping. We know that from the Second Circuit that that's a viable claim. From IMPACT's perspective, though, they simply were faced with a choice of to continue to litigate or to settle. They made an offer to settle with a 2010, then a 2011, then a 2012 date. The internal documents that ENDO produced to the FTC under the CID here made clear that the delay was their absolute top priority to shift the market before allowing entry. So this is a very different situation from a typical reverse payment case where a brand monopolist says, I plan to stay in this market for another 10 years and I'm going to make hundreds of millions of dollars every year. I'll pay some of that to buy more delay. Here, brand was actually looking to get out of the market and wanted to make sure that when there was generic entry, there would be no market left. And the reason this settlement is so pro-competitive is that without this settlement, even in a but-for world of litigation, there would have been no competition beyond 2013. That's what's critical here. I also just want to make a couple points about step one, because I think the FTC also made a mistake when it said at step one, the agreement actually has competitive effects. They didn't really say that because they didn't do the Amex required step of looking at whether in fact, in the real world, there were anti-competitive effects. That's what every rule of reason case going back to Justice Brandeis' articulation in Board of Trade was, where he said, you have to look at the condition of a market before and after the restraint was imposed. What the FTC did was they conflated the threshold finding under actives. Is there a large payment that's not justified by goods and services or defrayed legal fees? And if there is such a payment, then you have to go to rule of reason. But that doesn't necessarily obviate the requirement to do the analysis of anti-competitive effects. And in fact, the Supreme Court couldn't have been more clear when it said, we're rejecting the quick look to have a full rule of reason analysis. The only difference between the difference between quick look and rule of reason is quick look shifts the burden immediately to the defendant to show these pro-competitive effects. So I think in addition to the mistake at step three, flipping the burden in order to avoid having to do the balancing, I also think that there was a fundamental legal error at step one that conflicts with the activist determination and essentially tries to say, once you have a large payment that's not justified by these two factors that are in the opinion, that's automatically anti-competitive for purposes of rule of reason. If that were the case, the Supreme Court would not have said we're rejecting quick look. It seems to me in this case, your honor. So would your step one inquiry require basically an assessment of the patent validity or the infringement claim, which then you have to try a patent case within an antitrust case, which I think activists was trying to avoid? Absolutely not, your honor. And the court says very clearly it need not the plaintiff need not show and retry the patent case. And that's one of the things that that activist is clear about. Now, it doesn't mean, obviously, that in some cases, if by the time you're doing the antitrust analysis, you know what happened in the patent case, you know that the patent was invalidated or you know that the patent succeeded against four other generics. If you have to close your your eyes or your ears to that real world evidence. But no, there should have been an analysis of real anti-competitive effects. That's what what Amex tells you to do here. You could have shown that in the real world, the generic would, in fact, have launched earlier. Interestingly, although the the ALJ makes a specific finding that they would not have launched earlier, the FTC doesn't actually rebut that finding. They say in their footnote, footnote 26, they say the ALJ applied the wrong test again with a theoretical question. The real test is, could they have launched it? Well, every case involves a theoretical launch at risk. And I don't think you have to accept the FTC's judgment about what was theoretical here as evidence. You also could have shown, obviously, that the payment, for example, was larger in a case than the generic could possibly have made by being on the market with its exclusivity. That would be real world evidence of anti-competitive effects. But let me ask you about the negotiation history where the parties had reached an agreement with an earlier date and then the brand had introduced or the generic had introduced the idea of a payment. And then the parties went to a later date. I've seen that as well. Mr. Lefkowitz, I had a question about step two, which is post-activists. What cases have viewed the earlier entry date as a pro-competitive benefit? I think there's the Eastern District of Pennsylvania, that district court case. Are there any others that have allowed that as a pro-competitive benefit? Absolutely. The Lowestrin case, Your Honor, and the Soledim case, they say that the early entry in and of itself is a pro-competitive benefit. It's not that they say that you can necessarily decide that that's the only pro-competitive benefit, but that is certainly a pro-competitive benefit. And we have that here. Again, there was even if you just look at the original patent, there was early entry by eight months. But in this case, that might not be enough to win a balancing if you were balancing that against potential anti-competitive harm. Here, the pro-competitive harms are so overwhelming. And again, Your Honor, the real issue here is, and I think there's enough evidence in this record for this court to make a judgment on its own as to the facts here. But at the very least, Your Honor, it seems to me that the errors here are errors of important process in conducting a rule of reason analysis. This is an important case because it's really the first time the FTC has been forced to do a rule of reason analysis, and they have effectively arrogated to themselves what they wanted in Activist and didn't get, which was a quick look standard. Activist says, we absolutely know reverse payments are no longer immune from antitrust scrutiny. That's absolutely clear. But the court said we do a robust rule of reason analysis and a rule of reason analysis, as Amex tells us just two years ago, has very concrete steps that we're not adhered to here. I see my time is up. I'd love to reserve my remaining time for rebuttal. You have reserved it. We'll hear now from the FTC. Good morning, Your Honors. May it please the court. Brad Grossman for the FTC. I'd like to begin by pointing out the passage of Activist that I think is dispositive in this case, and that comes at page 158 of the opinion. It says, although the parties may have reasons to prefer settlements that include reverse payments, the relevant antitrust question is, what are those reasons? If the basic reason is a desire to maintain and to share patent-generated monopoly profits, then in the absence of some other justification, the antitrust laws are likely to forbid that arrangement. Your Honors, there is nothing in this record suggesting that Impacts had any rationale for this transaction, for the acceptance of a reverse payment, beyond a desire to share patent-generated monopoly profits. It could have obtained... I'm certainly trying to understand. It's a bold position being set out by the FTC in its briefing, and it may well be correct. That's our task. Is it basically the position of the FTC that none of the reverse payments can be upheld on anything other than foregone litigation costs and other sort of transactional costs that no longer have to be paid because of a settlement? And anything at all related to what is the principal reason for this payment in this case is just off the table. It will never be permitted. I wouldn't say that, Your Honors. I would say that activists plainly says that the rule of reason question is whether settling with a reverse payment leads to more competition than settling without a reverse payment. But just walk me through it in your view. What else could justify a payment from the brand to a generic other than actual out-of-pocket expenses that no longer have to be paid? Well, the first would be out-of-pocket expenses. The second, as activists itself discussed, if the money had some explanation other than a division of monopoly profits. For example, if the generic company was providing a legitimate service for that money, the money would be explained as something other than a monopolist exploiting its monopoly power to extend its monopoly beyond what the merits of the patent would warrant. In our brief, we also mentioned another example, which is a generic could argue in one of these cases that the money was actually vital to bringing the product to the market. It's the example of a cash starved generic. So a generic might be able to claim that without the money, it wouldn't have been able to develop the product and bring it to market. And the commission, if such an argument was made, would have to consider those facts and determine whether or not that sort of explanation passes muster. But Mr. Lefkowitz, at the beginning of his presentation here, Your Honor, conceded that in order to justify the reverse payment, he would have to show reasonable necessity under this court's controlling decision in United States versus realty multi-list. And what that decision said is where there's no argument that a restraint of trade is pro-competitive on its own, the defendant has the burden at the second stage of the rule of reason to demonstrate that the payment is both reasonably necessary and narrowly tailored to obtain the objectives. Here, Your Honor, the only objective that activist sites for this payment, I mean, impact sites for this payment, is the desire to obtain a license to after acquired patents that as of the time of this transaction, it was entirely speculative would have any benefit. So, no, the answer to that question is no. It was not reasonably necessary to obtain the payment. The only reason why impacts preferred settling with a payment is that it was more profitable. And, Your Honors, the efficiencies of this transaction have to be assessed at the time it was entered. And impacts, the only pro-competitive rationale as of the time it was entered, is a license to hypothetical future patents. And consider, Your Honors, the other side of this transaction. Impacts was well aware at the time of this deal that accepting this reverse payment could decimate the generic market for Opana ER entirely. They anticipated that Endo was going to have this product top. If Endo had successfully completed the product top, Your Honors, this license would have been virtually worthless. It would have been a license to compete in a market that wouldn't have even existed. And then on pages 45, 48, and 53 of impacts' brief, they concede that at the time of this transaction, the license that they claim is pro-competitive was unacceptable to them. That means that for whatever the benefits that impacts claims flowed from this license, they were outweighed by the benefits of continuing to litigate. Impacts' own expert at page 89 of the appendix makes quite clear what the framework is here. If a generic is going to be rejecting a settlement and preferring to litigate, the reason why it prefers to litigate is because it believes it's going to receive earlier competition through that litigation. And so here, the undisputed evidence, if you're judging this transaction at the time of the agreement, the only rationale for this agreement was anti-competitive. The citation of this license to after-acquired patents was nothing but a pretext. Impacts could have obtained the very same patent license either way. So the $64,000 question is, your honors, if this license was pro-competitive, why did impacts need to be paid off to take it? All of the benefits it cites are based on post hoc hindsight analysis that the antitrust laws do not credit. At the time of this agreement, impacts had no idea, first of all, whether the patents would even issue. Impacts had no idea that federal courts would subsequently uphold those patents. Impacts had no idea, so Endo's monopoly continues through 2017. Impacts had no idea as of the time of the transaction that in 2017, the FDA would determine that the new product top product, the reformulated product was unsafe. That's the only reason why impacts is on the market. It's an effect that impacts didn't foresee. And let's not forget the elephant in the room here, your honors, which is the following. Impacts is presently paying Endo to stay off the market. So they cite the benefits of the 2010 settlement agreement, your honors, but the 2010 settlement agreement didn't even resolve the party's dispute in this case. Impacts and Endo, seven years after the settlement, had to reach a second settlement in which impacts is now the monopolist and is paying Endo not to compete. If impacts wasn't paying off Endo, there'd be a competitive market. So it's, your honors, I submit, beyond perverse for impacts to be able to claim that this license is somehow pro-competitive when in order to obtain the purported benefits of the license, it's got to pay off its main. Its main competitor, I wanted to, if I can ask a couple of questions about step three, similar to what I asked the other side, why isn't the evidence that Endo was insistent on this product top, which required a January 2013 entry or an earlier entry would undermine the product top? Why isn't that evidence that would compel the conclusion that it would not have agreed to an earlier entry date? Well, the question under less restrictive alternatives could not possibly be, is there an alternative that a monopolist would have been willing to accept? The question under less restrictive alternative is if the parties are acting for a legitimate purpose rather than a monopolistic one, could they have reached a viable settlement agreement? And it goes back to the passage I led with on page 158 of activists, that the parties to this agreement have to explain why they preferred settling with a payment than without one impacts, proffers, no justification here, your honors. And I think I get to the question I asked the other side about sort of what's the standard. Is it what, in fact, they desired or wanted, or is it, is it what was possible, what was viable as you put it in a, in a non monopolistic transaction? But so what's your best authority on least restrictive alternative that it is the, it's the framework you're positing. Activists itself, it's activists itself. It says activists, it makes quite clear that, that, that parties can 158 activists makes quite clear. Parties can still settle these transactions without the use of the reverse payment. And the dispositive question under activists is what were the party's reasons for preferring to settle without the payment? The old impacts is only reason on this record for preferring to settle with a reverse payment is that it preferred to be paid off, receive a cut of monopoly profits. And contemporaneously, the business evidence shows impacts with had its eyes wide open. It knew if it accepted this deal, the generic market entirely could be wiped out. That's not a pro competitive rationale, your honors. That's an anti-competitive rationale. So, so at, at stage three of the rule of reason, what the commission did is it looked at, and professor Hovenkamp, by the way, who, who, who, who activists relied on in its, in its opinion said that he, what he said was to show a less restrictive alternative. It has to be based either on, on relevant industry experience or fairly obvious. And here, the answer is both the expert testimony shows that after activists, the rate of, of, of reverse payment settlements is actually increasing, not decreasing. And in the vast majority of these settlements, the parties are able to come to the table and settle without a reverse payment to eliminate the risk of even earlier competition. So, so we know that. And we also know from the admissions and impacts is brief. Okay. Impacts is impacts is brief admits that they could have gotten this license without the payment. They just prefer to be paid off. So one more question on this line, I understand if, if the FTC, as I read it sort of held two things at step three, first, what we've really been talking about, which is they said, oh, there could have been an earlier entry date without the payment. And that I understand how that's less restrictive, you know, whether it's feasible or not, the parties are vigorously disputing, but I, that, that to me is clearly would be less restrictive and earlier entry date. But the FTC also says, well, impacts could have agreed the same agreement, same January, 2013 entry without the money that I don't see how that's less that that allows competition at the same day, January, 2013. So how's that less restrictive competition? Well, impacts is argument on this point actually misconceives what the relevant anti-competitive harm here is. And it all goes back to our arguments at stage one of the rule of reason. The, the relevant anti-competitive harm here, isn't that the, the, the settlement in fact, for, for with a hundred percent certainty led to a later entry date. It's that a monopolist is using money to buy off the prospect of an earlier entry date. So even without definitive proof that, that, that the alternative settlement would have led to an earlier entry date, it's by definition, less anti-competitive because it doesn't contain that payoff to prevent an earlier date. But there's also the point that your honor mentioned, which is that there's no evidence in this record of, of, of, uh, and, and as you put it, it's a classic credibility assessment. There there's no evidence in this record of impacts ever actually seeking an earlier entry date than, than 20, than 2013, they simply acceded to the proposal of a 2013 date and money. The, the trial testimony of impacts is lead negotiator was not credible because he testified in his deposition. He had no recollection whatsoever of, of, of whether he saw an entry date before 2013 and he had no recollection of what endos reaction would have been. So, so, so they claimed that this payment was necessary to, to fill the gap again, that appears to be pretext. There impacts has not cited any documentary evidence in this record of, of impacts ever seeking, uh, a, a, a settlement in with, with an entry date in 2012. Um, but either way, that's only an alternative argument because either way, it's simply does not matter because impacts and it all goes back to what I started with. They cite no reason why they prefer to settle with the reverse payment rather than settling without one other than a division of monopoly profits. And that's what activists said. The antitrust laws condemn, uh, I I'd like to, uh, I'd like to, uh, move on now and, and, and focus on this question of pro competitive effects because impacts claims throughout the briefing that the FTC somehow presume this transaction anti-competitive. It's anything but the case. Uh, and, and I, and I'd, I'd point to, uh, the amicus brief of the 80 leading of 80 of the leading professors in this field, including several of whom, by the way, the Supreme court relied on an activist such as professor Hovinkamp and professor Lendley. And they said that the concessions that impacts has made in this litigation are unprecedented in the post activist case law. Because these cases, your honor, usually center on the question of what was the explanation for the payment? Could the payment be explained by something other than a division of monopoly profits impacts vigorously contested the purpose of the payment at trial. They argued that these payments were not a payment for deferred competition. They had other, they had other explanations. Well, they conceded on their administrative appeal to the commission. They dropped that point. They conceded it was a, it was an anti-competitive payment, um, without, without an explanation, but the division of monopoly profits and on their appeal, they can see the issue of market power. So, so, so the perverse thing in impacts is argument is they claim that the FTC somehow presume this transaction anti-competitive, right? But they concede all of the facts that make the transaction anti-competitive under activists. Um, Mr. Lefkowitz, his argument is that the FTC somehow needed to determine whether or not there would be entry on an earlier date. Uh, and he, he, he relies principally on two cases. He relies on the third circuit's decision in, in SmithKline Beacham versus King drug. And he, he relies on the California's Supreme court's decision in Cipro. Both of those cases, your honors, in fact, held the exact opposite of the proposition for which Mr. Lefkowitz has cited them. As we explained in our brief, both of those cases explain that when, when, uh, a, a monopolist is making a transfer of monopoly profits to induce a later entry date. That on its own is enough to show that the transaction is anti-competitive. Both of those cases, your honors held that the plaintiff meets its prima facie burden to show anti-competitive effects by demonstrating that the payment cannot be explained as anything other than a division of litigation costs as anything other than, um, a transfer of monopoly profits. That alone meets its prima facie burden. And we, we cite those cases quite clearly in our brief. Um, I'd like to, uh, just discuss, uh, your honors, the, the, um, the Wellbutrin case that came up during Mr. Lefkowitz's argument. Uh, he, he claimed that there are three district court cases that, that, that claim that, um, uh, a defendant could justify the entire settlement rather than the restraint of trade. Two of the cases, the Saladin case and the Loestrin case don't stand for that proposition. Uh, they were merely, um, those were merely evidentiary rulings, uh, allowing, uh, allowing expert testimony on that subject, but they were not, uh, they were not final judgments or even rulings on the merits, uh, holding that a defendant could in fact raise those justifications at trial. Uh, the case he's left with is the, is the, uh, in what Ray Wellbutrin case, um, that, that I'd like to explain, you know, I'd like to explain why that decision was, was incorrect. First of all, it's a decision in the Eastern district of Pennsylvania. That's contrary to the governing circuit precedent in the East, in that district, because the third circuit in, in, in, um, in Ray Lipitor, which is cited in our brief held that the defendants have the burden to justify at the second stage of the rule of reason, the rather large reverse payment. And what the court held in Lipitor is that a defendant cannot simply cite other provisions of the settlement agreement in order to proffer that justification. What's more, your honors, the decision in, in Wellbutrin actually contradicts this court's binding precedent in North Texas specialty physicians. Um, because in North Texas specialty physicians, what the court held was that the defendant needs to proffer a justification for the specific activities that are anti-competitive. Cannot, uh, simply, uh, proffer a justification for the agreement as a whole. It has to explain why the, the, the, the specific activities identified by the court as being anti-competitive are in fact pro competitive. Um, and, and the decision in Wellbutrin simply relies on a truism that, well, the contract was, uh, was negotiated as a whole. Therefore it has to be justified as a whole. Uh, your honors, that simply can't be. Again, it's, it's contrary to North Texas specialty physicians, and it's also contrary to, to this court's binding precedent in realty multilists. Which again, it doesn't, those cases don't say that a defendant can proffer a pro competitive justification for the contract as a whole. If the defendant is trying to justify, um, a restraint based on a separate provision in the contract. And there's no argument that the restraint itself, meaning the payment to prevent competition is, is justified. The defendant has to explain again, and Mr. The defendant has to concede that, that the, that the, uh, restraint is reasonably necessary and narrowly tailored to achieve the pro competitive end. And again, there's no argument here that the restraint was in any respect, the payment to stay off the market was in any respect, reasonably necessary or narrowly tailored to, um, to impact this objective for competing. And the commission was absolutely right to say that, uh, that there's no argument in this case. And if, and, and, and, and if this court wants to reduce this case to one principle, it's this, there's no argument in this case that the reverse payment that impacts accepted has led to more competition than, than, than, than, uh, than settling without the reverse payment. It cites the benefits of this, of this license. All of the benefits of the license are based in hindsight, including impacts, paying its rival to stay off the market. And based on everything that impacts knew at the time, this transaction was unambiguously anti-competitive. It entered the deal and took cash for, for a transaction that it foresaw would decimate generic competition entirely. And it's citing a license that based on what it knew at the time would have been totally worthless if events had tried, had, had played out as the parties had predicted they would. So, uh, unless the court has any further questions, I'm happy to, to rest at this point. Thanks, Mr. Grossman. I guess that's all we have from you. You saved time for a rebuttal, Mr. Lefkowitz. You're muted. Mr. Lefkowitz, you're muted. Unmute. Yeah, there you go. I apologize for that. I was trying to be, be quiet. That's all right. Hey, Mr. Lefkowitz, let me just ask you the one question that I have. It seems like a major part of the FTC's argument is this passage from Activist, page 158, that says, look, parties may have reasons to prefer a reverse payment. Well, what are the reasons? And it seems to me that what the FTC is saying is that impacts has essentially conceded that the only reason is to get a cut of monopoly profits. I mean, what's your response to that? My response, Your Honor, is that actually nothing could be further from the truth. In a situation where a company has this giant product that wants to stay on the market, it might well decide, I'll pay some of that monopoly rent to a generic to keep him at bay, and I'll just keep making the monopoly. Here, ENDO was getting out of this market. The last thing it wanted was to stay in the market or for anyone else to be in the market. And at age 20 of the FTC's decision, the FTC acknowledges that they were planning this product at the time of the settlement. At R27 in the record, we see the very request for an entry date of 2012 that Mr. Grossman said didn't exist. It was requested and it was rejected. In this case, the payment was actually contingent. Here's what makes this case so shockingly different. ENDO ultimately had to pay a lot of money to IMPACT, but it was totally contingent on them killing the market by more than 50 percent. Where else do you have a party to a monopoly rent share splitting agreement agree to an agreement where he might get zero money? Here, if in fact ENDO had not killed the market, there would have been no cash payment at all. The cash payment was really a form of insurance to make sure that when ENDO got into the market, there was a market to be in. The last two points I'd like to do is also there was also the no AG agreement, which has. I mean, that's recognized as a payment because it allows you once you enter not to face a generic competition from ENDO. That's right. And a no AG is certainly the kind of thing that the courts have now said does not allow you to be in that world of immunity. You have to get into the rule of reason. But in this situation, the no AG with the AG was never even going to happen because the last thing ENDO would have ever done in a market that it was exiting and trying to convert would have launched its own generic. The whole point of ENDO strategy was no generic competition at all. The fact is, this is a situation where IMPACT could not have gotten the broad licenses it got if it had continued to litigate. So this settlement is clearly better than any alternative settlement that could have happened in the real world. They flip the burden to say, well, it's our burden to show that it's better than any hypothetical settlement. And in closing, I'll just say activists says at the end of page 156, an antitrust defendant can show in the antitrust case that legitimate justifications are present. We were denied that opportunity to show that real pro-competitive benefits outweighed the anti-competitive effects such that they might have been. And that's where they made a mistake. They short-circuited the entire rule of reason process. All right, counsel, we appreciate both of you bringing your arguments to us. We have a lot to think about. Thank you. Thank you very much, Your Honor. Stay safe. Thank you. Good luck to you both. Thank you.